Thomas M. Lancia PLLC
By:  Thomas M. Lancia, Esq.
22 Cortlandt Street
16th Floor
New York, New York 10007
212.964.3157

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

INSTITUTIONAL INVESTOR, LLC                    :

                              Plaintiff,        :        <u>COMPLAINT</u>

                        - v -                   :        Jury Trial Demanded

                                                :        16 CIV. 941

MORGAN STANLEY & CO. LLC , JONATHAN            :
YELLEN and CHARLES SHANNON                      :

                              Defendants.       :
-------------------------------------------------------------X

Plaintiff INSTITUTIONAL INVESTOR, LLC ("II" or "Plaintiff"), by its attorneys,

Thomas M. Lancia PLLC, brings this civil action against Defendants MORGAN STANLEY &

CO. LLC ("Morgan Stanley"), JONATHAN YELLEN ("Yellen") and CHARLES SHANNON

("Shannon") (collectively "Defendants") and complains as follows:

## PARTIES AND JURISDICTION

1.      By this Complaint, II seeks statutory damages, actual damages, compensatory

damages, treble damages, punitive and exemplary damages, injunctive relief, and their attorneys'

fees and costs pursuant to the Copyright Act, 17 U.S.C. § 501 *et seq.* and for breach of contract,

fraud and deceit, and misappropriation of confidential business information and/or trade secrets.

2.      II is a Delaware company with its principal place of business at 225 Park Avenue

South, New York, New York 10003.  Morgan Stanley is a Delaware limited liability company

with its headquarters located at 1585 Broadway, New York, New York 10036.  Jonathan Yellen

and/or Charles Shannon were at all pertinent times employees of Morgan Stanley.

3.      Pursuant to 28 U.S.C. §§ 1331 and 1338(a), the Court has subject matter

jurisdiction over the Plaintiff's claims for copyright infringement, brought under the Copyright

Act, 28 U.S.C. § 501 *et seq.*  The Court has supplemental jurisdiction over the Plaintiff's

remaining claims pursuant to 28 U.S.C. §§ 1338(b) and 1367.

4.      In their respective license agreements with Plaintiff, Defendants Yellen and

Shannon each consented to the exercise of personal jurisdiction by this Court.  Additionally,

upon information and belief, this Court has personal jurisdiction over Defendant Morgan Stanley

because it (a) is a foreign limited liability company with headquarters in New York; (b)

purposefully directs activities towards the state of New York, including product sales; (c)

regularly conducts and solicits business in the state of New York; (d) derives substantial

revenues from goods and/or services provided to customers in the state of New York; and/or (e)

regularly and purposefully accessed Plaintiff's servers located in New York.

5.      Venue is proper in this Court pursuant to, *inter alia*, 28 U.S.C. § 1400(a).

## FACTUAL BACKGROUND

6.      Euromoney Institutional Investor PLC ("Euromoney") is one of Europe's largest

business and financial magazine publishers, delivering business information to various sectors,

including finance, law, and energy, for over 35 years.  Euromoney publishes print and online

magazines, journals, and newsletters among other things.  II is the United States subsidiary of

Euromoney.  II owns copyrights in both of its print and online editions of publications, journals, ebooks and the like. Among these online publications is Power Finance & Risk, which was also known as Power Intelligence during the time frame relevant to this action, an exclusive daily information service focused on the power industry, providing updated news, features, analysis and data, including project finance in generation, transmission and midstream gas assets.  Power Finance & Risk is provided through a password-protected internet website available only to subscribers ("Website").  Subscribers pay for single or multiple user licenses for a fee to access the content contained on the Website.

7.      The first time the Website is accessed by a new subscriber, he or she must indicate agreement with the terms and conditions of the Website before he or she is permitted to view the exclusive and unique content.  Among those terms and conditions in effect at the time Yellen and Shannon respectively subscribed to the Website are provisions pertaining to use. Section 3.2 of the Terms and Conditions expressly states that "[y]ou agree to use the Sites and the Content solely for your own personal use and benefit and not for resale or other transfer or disposition to any other person or entity." Further, Section 6.4 of the Terms and Conditions states that:

> "Except to the extent a user name and password is intended for more than one licensed user as agreed by us in writing, the following are not permitted:
>
> > a) any Registered User, Subscriber or licensed user under any subscription sharing their user name and password;
> >
> > (b) access through a single name and password being made available to multiple users on a network . . . "

Finally, Section 15 of the Terms states "You agree to indemnify and hold us, our Representatives, licensors and sub-contractors harmless against all costs, claims, damages,

liability and expenses (including any professional fees) which we might incur by reason of a breach by you of these Terms… this indemnity shall extend (without limitation) to any losses which we may suffer as a result of the use by third parties of your user name and password…"

8.      Despite the terms of this license, the Website was used by Defendants well in excess of the use authorized by Plaintiff.  Indeed, the Plaintiff's internet website logs for Yellen and Shannon's respective subscriptions indicate a frequent, repetitive and nearly simultaneous access far in excess of a typical single user, including numerous occasions when multiple unauthorized users accessed the Website materials from different locations within a short amount of time.

9.      Plaintiff offers subscriptions to the Website in electronic format, allowing subscribers to browse and search the Website and its content easily and efficiently.  The format is updated frequently and new materials are added on a daily basis.  Emails are sent daily informing the user of the content and the user can save articles or other data in files maintained and controlled by the Plaintiff for easy access at a later date.  Each quarter, all of the articles posted to the Website during that quarter are made available to subscribers in one compilation, as a print supplement ("Supplement"), which is mailed to all subscribers.  Subscribers are able to email articles to other individuals.

10.      Every Website subscriber has a confidential password and identification number unique to his or her account. The password must be entered manually into the subscriber's individual computer terminal, laptop, or mobile device the first time that device is used to access the Website, which then triggers a technological process providing access to the Plaintiff's server by the server accessed by that individual computer terminal, laptop, or mobile device.  The

servers in turn usually "talk" at least in part via satellite.

11.     The articles posted on the Website constitute original material authored by II. Plaintiff has complied with the copyright laws and is the exclusive owner of the copyrights therein, including all rights infringed by Defendants.

12.     Each quarter, each Supplement, including all articles published by II on the Website, is registered with the United States Copyright Office.  The Register of Copyrights has issued Certificates of Registration for the Supplements under registration numbers TX0008071479,     TX0008035666,     TX0008043218,     TX0008071416,     TX0008065523, TX0007720324, TX0007822874, TX0007700666, TX0007668230, and TX0007691397. The registrations mentioned in this paragraph are those applicable to the infringements discussed in this Complaint.

13.     II regularly polices the Website using Back Office Administration Tool ("BOAT") tracking software.  BOAT tracks every action taken by an individual user's account, including IP addresses, Website logons and article and page views.  This information is contained in an Excel spreadsheet containing confidential business information and as such cannot be attached to this Complaint on the date of filing.  When unauthorized access is suspected, II employees must sift through the information and compile it into a format that is readily and easily understood, taking up employee time at great company expense.

14.     In September of 2011, when he subscribed to the Website, Yellen agreed affirmatively to the Terms and Conditions for accessing the Website by clicking on the button indicating as such.  At all pertinent times, Yellen was acting within the scope of his employment

with Morgan Stanley.  He paid for a single, one year user license at $ 2,995.

15.     Despite the agreement by Yellen to abide by the Terms and Conditions, Plaintiff's Website logs confirmed that multiple users accessed the Website and exceeded the number of users permitted for the fee paid.  These unauthorized users accessed the Website by receiving the confidential password from Yellen without authorization from the Plaintiff; these users then logged on to the Website using Yellen's confidential subscription information and reproduced the articles and other content therein on their computer screens and/or downloaded or printed copyrighted material without first seeking permission or authority from the Plaintiff.  Morgan Stanley, at all relevant times, did nothing to corral the abusive infringing conduct in which its multiple employees were engaged.

16.     One indication that Yellen shared his confidential password with other Morgan Stanley employees are multiple article views within a very short amount of time or even at the same time.  The article "Two More CS MDs Exit" was viewed at 20:07 (8:07 p.m.) and 20:11 on June 28, 2012; on June 29, 2012, "Judge OKs BrightSource, NextEra For Solar Trust Assets [Update]" was viewed both at 19:11 and 19:14; on July 5, 2012 at 15:26, "CPV Hunts $550M Club for Gas-Fired Plant" two different times; and "Sunny Mac Floated As Solar Securitization Booster" was viewed twice at 20:21 on August 8, 2012.  On August 9, 2012 at 19:50, the article "EverPower Tees Up Bonds For Alta Purchase" was viewed twice on Yellen's subscription.  At 20:33 on October 10, 2012, two articles were viewed – "Solar Players Scope Tax Equity" and "Finavera Nixes Project Sale For Corporate Deal;" just two days later, on October 12, 2012, the articles "Astoria Pricing Details Emerge," "MLPs Heat Up For Midstream Gas, LNG Sponsors", and "Caithness Taps Citi For L.I. HoldCo Debt" were all viewed.  "Enel Snares Tax Equity For

Wind" was viewed four (4) different times on October 17, 2012, at 23:35, 23:36 and twice at 23:43, while at 22:12 on October 19, 2012 "Sisyphus or CFIUS' Can the President Roll the Development of Your Power Deal Down the Mountain?," "Ex-AES Execs Hunt $800M For Gas-fired Plant," and "Sempra Evaluates Unregulated Gas-Fired, Solar Auctions" were all viewed; on October 26, 2012 "Cogentrix, Quantum Tap RBC For Coal Refi" was viewed at 13:21and 22:09 and "Quantum Targets More Deals After Coal-fired Refi" was also viewed that day at 13:21, 22:08, 22:09, and 22:13; those two articles were also viewed on October 29, 2012 at 21:39 and October 28, 2012 at 21:21.

17.     The same conduct continued through 2013.  On January 8, 2013 "EIF Snags Brooklyn Navy Yard" was viewed at 00:13, 00:39 and 00:42 and "Wind PTC Extended In Fiscal Cliff Deals" was also viewed at 00:39.  On January 30, 2013 at 2:28 Yellen's account was used to view "Nev. Shop Hunts Renewables Developer," "Investec Banker Joins Brookfield," and "Cheniere Hits The Road For $1B 144a."  On March 5, 2013, six views of the same article occurred by Yellen's subscription, from two different IP addresses – on that date "Highstar B Commitments Due At 5pm" was viewed twice at 20:42, twice at 20:45, at 20:46, and at 20:51. Yellen's subscription also viewed "Gussy Up For Sale?: NextEra Plots Leverage, Hedges For Texas CCGTs" on March 20, 2013 at 21:20, 21:26 and 21:40;  the article "BrightSource Hunts for Palen Financing" was viewed twice at 44:46 pm on March 22, 2013; on April 4, 2013 at 20:49 both "Essential Power Eyes Refi...Again" and "Cameron Stalks 16-yr LNG Debt" were viewed and on April 5, 2013 at 3:18 "Cameron Stalks 16-yr LNG Debt," "Essential Power Eyes Refi...Again" and "Sempra Unit Stalks LNG Funds" were all viewed.  Yellen's account was also used to view "Essential Power Eyes Refi ... Again" twice at 6:20 and 6:21 pm on April 8, 2013; on April 12, 2013 at 21:14, "ArcLight Exec Taps The Maple Syrup Biz" and "The Buzz: Las

Vegas And The NatGas Question" were both viewed from different IP addresses; in the same minute, 22:25, on April 15, 2013 both "NADB Backs Air Force Solar" and "Hannon Targets Thursday REIT Listing" were viewed by Yellen's account.

18.     Additional articles views by Morgan Stanley employees improperly using Yellen's subscription information like the ones described above occurred. For example, on April 20, 2013 at 3:03, the articles "K Road Taps Santander, Pru For Solar," "U.S. PowerGen Looks To Sell Astoria Gen…Again," and "The Buzz: The Year Of The B Loan" were all viewed (in the same minute) by Yellen's subscription; the next minute, at 3:04, two more articles entitled "Q1 Bank League Tables: Europeans Surge In North America PF" and "NRG To Use Cash For Gregory" were viewed; on April 24, 2013 two articles were again viewed at the same time at 2:38 – "Ciachurski-Led Shop To Buy Utah Wind Project" and "Yield Hunt Pushes Institutional Investors Into Power;" similarly, at 4:18 on April 30, 2013 both "BrightSource Talking To Equity Partners" and "pricing Emerges On Channelview" were viewed by people using Yellen's account information; finally, on May 1, 2013 both "ECP To Roll Out B Loan" and "CS Welch Set To Join Energy Transfer" were viewed in the same minute, 21:57.

19.     After Yellen's subscription ended, Morgan Stanley requested that Defendant Shannon be given an individual subscription to the Website on or about January 13, 2014.  II understood that the infringing practices present with Yellen's subscription had been stopped by Morgan Stanley's compliance team.  Just as Yellen had, Shannon agreed affirmatively to the Terms and Conditions for accessing the Website by clicking on the button indicating as such.  At all pertinent times, Shannon was acting within the scope of his employment with Morgan Stanley. He paid for a single, one year user license at $ 3,395.  Shannon's subscription saw

normal activity at first, but unusual infringing activity began sometime in February 2014. The first time that Shannon's subscription showed odd activity was on February 1, 2014 when at 00:55, the articles "Optimism Surfaces" and "Rockland Seals Fund In Six Months" were both viewed and the Mergers & Acquisitions and People & Firms Website channels were both visited; on February 4, 2014, the following activity was tracked at 00:59 – Shannon's account visited the Project Finance channel three times, the Borrow Strategies channel twice and the People & Firms channel while also viewing and printing the article "Conergy Launches U.S. Solar Fund;" on February 6, 2014 at 6:16, the People & Firms and Mergers & Acquisitions channels were both visited and the article "Banks Flock To Freeport LNG" was both viewed and printed; later that day, at 23:40, "Blackstone Seeks B Loan For ERCOT M&A" and "BlueEarth Close To Landing Ontario Solar Funds" were both viewed and printed and three different Website channels were visited; just two minutes later, "Blackstone Seeks B Loan For ERCOT M&A" was viewed again.

20. Continuing the abnormal conduct, on February 8, 2014, at 6:30 "Atlantic Floats Refi Amid Covenant Overhang" and "SunPower Teams Up With BofA For Residential Solar Financing" were simultaneously viewed and printed and at 6:32 that day "The Buzz: B Loans Hum" and "MACH Gen Circles Pre-Pack With 2d Lien" were both viewed and printed and four Website channels were visited. The article "Weatherley-White Joins Exchange Headed Renewable Shop" was viewed and printed at 7:54 on February 12, 2014, while at the same minute "EverPower Chases Merchant EME Wind Farm" was also viewed and the channels Login New, Project Finance, People & Firms and Mergers & Acquisitions were all visited; in just two minutes on February 13, 2014, "BlackRock Scoops Fourth Ontario Solar Asset" was viewed and printed two times, "Brookfield Scopes Hydro Financing" was viewed and printed and three Website channels were visited by Shannon's account; at 1:25 on February 19, 2014,

"First Wind Secures Lone Star Wind Package" and "Duke Issues 300 MW Solar RFP" were both viewed and printed; on February 22, 2014, "B Loan Boom Set To Continue On M&A Activity" and "PTC Rush Leads to Blockbuster Year For Wind" were both viewed at printed in the same minute, 1:07, at the same time that Mergers & Acquisitions and People & Firms Website channels were visited.   On February 27, 2014 at 4:10, both "Special Report: Financing and Developing LNG Export Facilities In The U.S." and "Sponsors Target Debt For $2.2B Transmission Project" were viewed and printed; on March 4, 2014 at 2:32, "NTE Energy To Seek Equity, Debt For Projects" was printed and viewed and the channels Project Finance, Borrower Strategies, and People & Firms were all visited; on March 6, 2014 "Xcel Calls For 150 MW Of Solar" was printed and viewed at 3:45 and the Borrower Strategies and People & Firms Website channels were simultaneously viewed and at 3:46 that day, the Mergers & Acquisitions channel was visited three distinct times; on March 6, 2014, a manual login occurred and the Project Finance channel was visited at 17:07, but a the same time someone arrived to the Website using an search engine and viewed "LS Weighs Doswell B Loan As Sale Crawls;" at 1:06 on March 7, 2014, three different channels were visited and the article "JPM, Panda To End Lease On Md. CCGT" was both viewed and printed; two articles, "The Buzz: It's A Good Time To Be A Borrower" and "PPA Pulse: Utilities Cram Wind Contracts," were viewed and printed in the same minute.   This conduct is hardly reflective of normal Website usage by a single individual.

21.  The articles "Infigen Stokes $1.8B Solar Development Pipeline" and "LatAm Energy & Infra 2014: Mexican Energy Reforms To Boost Renewables" were both viewed and printed at 5:10 on March 15, 2014; between 7:16 and 7:18 on March 20, 2014, three articles were viewed and printed successively; at 00:43 on March 21, 2014, Shannon's subscription was used to logon

to the Website, visit the Project Finance channel and both view and print the articles "ECP Refi Closes Oversubscribed" and "Napolitano Exits RBC"; on March 22, 2014 at 21:05, two channels were visited and the article "Developers Rethinking Financing Options Under ITC Expiration Cloud" was viewed and then printed twice; on March 27, 2014 at 20:51, there were three logins to the Website, one through a cookie and two manual; also on March 27, 2014 at 21:01, the article "Initial Acciona Renewable Bids Trickle In" was viewed two different times and printed, and two Website channels were then visited; on March 28, 2014 at 16:59, the Project Finance channel was visited twice, the Mergers & Acquisitions channel was also visited, "Calif. Shop Closes Mass. Solar Debt" was viewed and printed; in the next minute, "Rockland To Take ArcLight Texas Cogen Stake" and "Entegra Readies Ark. CCGT Unit Sale' were both viewed and then printed. On April 1, 2014 between 6:58 and 7:02, all of the following activity was tracked: the Project Finance channel was visited at 6:58, 7:00 and 7:02, the Borrower Strategies channel was visited at 7:01 and again at 7:02, the Mergers & Acquisitions channel was visited at 7:02, "BNP's Plastina heads To Institutional Investor" was viewed at 6:58 and printed at 6:59, "Macquarie, Partner To Fund Projects' Real Estate Costs" was viewed and printed at 7:00, and "SolarCity Securitization Penciled For April" was viewed at 7:01 and printed at 7:02.

22. Day after day, Shannon's subscription to the Website was accessed by unauthorized Morgan Stanley employees viewing and otherwise making use of the copyrighted articles and other material. On April 3, 2014, the Project Finance channel was visited at 6:12 and 6:14 and during that same two minutes span, "AMP Infra. Debt Fund Hits $750M," "Canadian Solar Lands More Solar Debt" and "SolarCity Prices Second Solar Securitization" were all viewed and printed; on April 5, 2014 at 1:21, "EIF Shooting For $500M Newark Gas-Fired Unit" was viewed and then printed at 1:22, at which time the Project Finance channel was visited and the

article "Buzz: ArcLight Keeps Selling, Solar Stays Strong" was viewed and printed; the very next minute the Project Finance channel was visited again and the article "Geronimo Advances Milestone Utility Scale DG Solar Project" was viewed and printed. On April 11, 2014 at 7:12, Shannon's subscription visited the Project Finance, Borrower Strategies and People & Firms channels, while simultaneously viewing and printing the article "DG Growth Drives Questions On Utilities' Roles;" in just two minutes on April 14, 2014, "Blackstone Affiliate Closes On Mexico Wind," "Georgia PSC Issues Mammoth Solar RFP" and "AES Solar Affiliate Increasing Tenaska Solar Stake" were all viewed and printed; on April 17, 2014 at 5:45, two articles "Small-Scale Wind Co. Hunts Financing" and "SunPower Lands Hannon Armstrong Funds" were viewed and printed; at 2:27 on April 22, 2014, two different Website channels were viewed while "SMBC Picks Up BBVA Banker" and "PPA Pulse: Hunt For Solar PPAs Heats Up" were both printed and viewed; "PPA Pulse: Hunt For Solar PPAs Heats Up" was also viewed two more times on April 23, 2014 at 13:45 and 15:05; at 7:27 on June 4, 2014, Shannon's account viewed the Project Finance channel, then viewed "DOE Staffer Joins Texas Shop", visited the Mergers & Acquisitions channel, and viewed "ArcLight Tees Up Bayonne Purcahse, Refi."

23. On June 7, 2014 at 5:20, June 10, 2014 at 6:53, and again on June 11, 2014 at 4:15, the weekly PDF for June 9, 2014 was downloaded; additionally, on June 6, 2014 the Project Finance channel was visited at 4:14, then at 4:15 the Mergers & Acquisitions channel was visited and "PPL, Riverstone To Merge Unregulated Fleets" was viewed; that article was viewed again and printed at 4:16 at the same time the Mergers & Acquisitions channel was again visited. On August 12, 2014, some interesting Website access was tracked by the BOAT software: at 19:34, the Home channel was visited twice and the Project Finance channel was visited once, the article PPA Pulse: SoCalEd Loads Up" was viewed at 19:35 at the same time was the Login New

channel was visited and the article "Tenaska Fires Up Pa. Gas-Fired Capital Raise; that article was printed at 19:47, but at 19:49 a sub-page of the article "PPA Pulse: SoCalEd Loads Up" was viewed, which could not have occurred if one individual was performing all of these functions; then also at 19:49, the article "SunShare Moves To 2d Round" was viewed and then printed the next minute; at 19:50 the article "Leggett Exits Morgan Stanley" was viewed and in the next minute at 19:41, "UBS Lassoes Morgan Stanley MD Pair," "Co-Op Calls For ERCOT Acquisitions" and "IRS, Treasury Release PTC Clarification" were all viewed and the Mergers & Acquisitions channel was visited; then at 19:52, "IRS, Treasury Release PTC" and "Co-Op Calls For ERCOT Acquisitions" were printed, "NextEra Pockets PTC-Eligible Project From TradeWind" was viewed" and "Pattern Picks Up Texas Wind Project" was viewed and printed; "IRS, Treasury Release PTC Clarification" was printed a second time at 19:53. The next day, August 13, 2014, Shannon's subscription was used to visit the Login New, Project Finance twice, and Mergers & Acquisition channels at 16:20; on August 14, 2014. The articles "Fortistar Angles For Primary," "Stark Looks To Exit Invenergy Plant," "NRG Yield Seals Alta Acquisition" and "HASI Blueprints Equity, ABS Plans" were all viewed at 22:19; two of those articles were printed at 22:20; on August 20, 2014 the Mergers & Acquisitions and Project Finance channels were visited at 20:43 and the article "Paper Shop Nears Hydro Portfolio Deal" was viewed; then at 20:44 four different channels were visited and the article "Paper Shop Nears Hydro Portfolio Deal" was viewed for a second time; on August 21, 2014 at 21:45, the Login New channel was visited and the articles "Hydro Shop Scouts Equity," "Invenergy Hunts Quebec Wind Funds" and "Starwood Inks Texas Wind Debt, Tax Equity" were all viewed then printed at 21:47. On August 25, 2014 there was similar infringing conduct – at 22:31 two channels were visited, at 22:32 "Calpine Lands Fore River," "TransCanada, Elecnor Quit Alberta

Transmission RFP" and "Greenwood Makes Mexico Solar Move" were viewed; at 22:33 "LS Refis Cross Texas" was viewed as well as "Morgan Stanley Takes Over NaturEner Wind Porfolio" which was then printed; in that same minute "Greenwood Makes Mexico Solar Move" was also printed.

24.   Continuing to September 2014, on September 5, 2014, "Apex Hits Hurdles In Financing Okla. Wind Pair" was viewed at 22:28, at the same time as "Bankers Eye First Solar Deal For YieldCo Signals", and printed at 22:29; at 22:50 on September 16, 2014, the following was tracked: the Login New and Project Finance channels were visited and "Duke Lands 278 MW From Solar RFP," "ArcLight Peddles Bayonne" and "PF Mart Gears Up For 2 GW Of Wind" were viewed; at 22:41 that same day, "Exelon Downsizes, Flexes Texas B Loan" was viewed and printed and "Duke Lands 278 MW From Solar RFP" was printed; on September 29, 2014 "Acciona, KKR Target Q1 Yieldco Listing" was viewed twice at 21:44 and again at 21:45; on October 31, 2014, "Southern Courts Solar Tax Equity Partnerships' was both viewed and printed at 20:28, "EIF Hunts Oregon Co-Owner" was viewed at 20:28 and printed at 20:30, "Cheniere Hunts Mammoth $11.5B LNG Financing" was viewed at 20:33 and "NRG, LS Among Shops Hunting PF Repricings" was viewed at 20:36. The articles "NRG Yield Nets Wind, Gas-Fired Bundle" and "Blackstone Upsizes B Loan To Fund Optim Purchase" were both viewed and printed at 22:45 and 22:52, respectively, on November 10, 2014; on November 12, 2014 "First Wind Wraps Texas Wind Financing" was viewed at 00:52, printed at 00:53 and printed again at 2:44; also at 00:52 the article "DTE Scores LS Peaker" was viewed.

25.   The infringing conduct continued in 2015. At 7:16 on February 12, 2015, the articles "SunEd Nets Financing, Stake Sale For Chile Project" "Canadian Solar Eyes YieldCo After

Recurrent Acquisition" and "Harbert Clinches $485M Fund" were viewed; on June 8, 2015 when the same weekly newsletter PDF was downloaded twice in the same minute, at 23:52; the same newsletter was downloaded again the next day two more times at 22:35 and 22:39. On June 10, 2015, Shannon's account information was used to view the article "8minutenergy, D.E. Shaw Cirlcd $160M Solar Financing" both at 23:06 and 23:09 and print it at 23:08; the article "AES Brasil Circles Petrobras' Thermal Portfolio" was viewed on June 16, 2015 at 22:23, 22:40 and 22:47 and printed that day at 22:23 while the very next day it was viewed two more times, both at 2:17, and also printed that same minute. On June 8, 2015 at 23:50 and again on June 9, 2015 at 00:39, "Barclays Banker Heads to BAML" was viewed from two different IP addresses.

26. The infringing conduct seen with Shannon's Website subscription did not stop – the following are more examples of multiple, short span, article views that strongly indicate numerous users improperly accessing the Website through Shannon's logon information. "Berkshire Hathaway Circles GE Gas-Fired Stakes" was viewed on June 8, 2015 at 23:28, 23:39, and 23:41 and also printed that day three times, at 23:40, 23:41 and 23:53; it was also viewed once more the following day at 22:41; on June 30, 2015 at 22:58, 23:13 and 23:17 the article "Caithness Scraps M&A Deal, Seeks Loan" was viewed and also printed at 22:58; "CEO Departs Renewables Shop" was viewed and printed twice, all at 19:14 on July 16, 2015; "Community Scoops Amazon Utility Scale PPA" on June 18, 2015 was viewed at 21:41 and also viewed and printed that day the very next minute, at 21:42; "Completed Project Finance Deals" was viewed two times in two minutes on July 7, 2015; on August 13, 2015, individuals using Shannon's Website account viewed "CPV Stalks Financing For Towtanic" for distinct times at 12:44; on June 16, 2015, "CPV Lands $1B For NY CCGT" was viewed at 0018, 00:23, and 00:30 and printed at 00:31; "DTE Could Stretch To 100 MW With Solar RFP" was viewed by

Shannon's account at 23:20 on June 26, 2015 and then printed twice that day, at 23:22 and at 23:23; on July 1, 2015 "Duke Unit Makes Stellar Purcahse" was viewed at 23:06 and printed both at 23:07 and 23:10 while during the same minute, 23:06 "Duo Nets Debt for Texas Wind Farm" was viewed; the latter article was also printed on that date twice, at 23:09 and at 23:10.

27.  One more egregious example of the password sharing that was happening occurred on June 9, 2015 when the article "Expected Rate Hike Propels New Utility Issuances" was viewed ten (10) different times – at 22:34, 22:36, 22:39, 22:45, 22:47, 22:54, 23:00, twice at 23:01, and at 23:17.  Website usage and article views such as this cannot be explained by any situation except rampant, improper and infringing confidential Website logon information being shared with multiple Morgan Stanley employees.  Continuing the pattern of multiple article views, "FERC Greenlights PJM Auction" was viewed at 22:51, 22:53 and 23:02 on June 12, 2015 and then printed at 23:02; "First Wind Wraps Texas Wind Financing" was viewed at 00:52 and printed both at 00:53 and 2:44; "Mexican Retailer With Permit Clinches $260M For Wine" was viewed at 2:00 on June 12, 2015 and printed at 2:03 and 2:05; "SunEd Partnership Brings Prospect Of YieldCo-owned Storage Closer" was viewed at both 23:01 and 23:13 on June 20, 2015 and also printed at 23:01 on that date; "SunEd, Terraform power Acquire Rooftop Solar Shop" was viewed at 23:42 and 23:46 on July 20, 2015; Shannon viewed "SunEdison Nets Debt, Tax Equity For South Plains II" on August 7, 2015 at 00:54 and printed it two different times at 00:55; on July 2, 2015, Shannon viewed the article entitled "Supreme Court Decision Could Push Back Coal Retirements" twice at 9:18 pm; and on June 9, 2015, "TerraForm Upsizes Bonds To Acquire Solar Projects" was viewed at 22:39 twice, at 22:49, 22:41 and 22:57 and was also printed at 22:39 and 22:58.

28. Various other conduct indicates multiple unauthorized users accessing the website using Shannon's single user name.    For example, on July 31, 2015, someone logged in at 1:36 am, viewed and printed some articles and then logged off at 1:41 am.   The account was then accessed through a cookie the next day at 1:07 am.  A similar occurrence happened on June 22, 2015, where the II system was accessed through a cookie twice, once at 10:02 pm and then again at 11:37 pm. It is impossible to login manually and then logoff and then log back in using a cookie, and yet the same occurred over and over again.  On June 18, 2015, someone logged off at 00:55, then the Website was accessed through a cookie login at 1:03, the account logged out against at 1:03; next, at 1:08 there was a manual login and a manual logout at 1:24; at 1:58 that day, the Website was accessed through a cookie and at 21:41 there was distinct manual logins, with another manual login occurring at 21:42.   Again on June 25, 2015, there was a manual logoff from the Website at 1:38 and then a cookie login later that day at 20:24; Shannon's account was logged out on June 30, 2015 manually at 23:18 and the next day on July 7, 2015 a cookie logon occurred at 23:06; another manual logout occurred at 23:55 on July 6, 2015, with a cookie login to follow on July 7, 2015 at 20:50 and another manual login that day at 23:38.  The reverse also occurred.   The account was accessed first through a cookie and then accessed minutes later via a manual login.  There is no need to access manually by typing in the entire password when you can access through a cookie.  As but one example, at 12:02 am on June 16, 2015, the account was accessed via cookie once and then again at 12:15 am.  It was then accessed manually at 12:23 am and then yet again via cookie at 12:29 am.

29.   When Shannon was the subscriber, users also printed articles several times in addition to the printings discussed above, often within the course of a few minutes, a sure and common indication of multiple use.  As but one of many examples, he printed the article "EIF-

Backed $700M Project Financing Nears Close" three times in less than ninety seconds on June 18, 2015. On July 22, 2015, between 12:58 and 1:01 am the article "TerraForm Global Gets Rating Ahead Of Bond Debut" was printed four times. Shannon's account was also used by multiple people to perform searches for the same search term in relatively short periods of time. The term "gas" was searched at 21:03 and three different times at 31:31 on June 25, 2015; "infrastructure" was searched two times in the same minute, 21:04, on June 25, 2015; also on June 25, 2015 "oil" was searched two times at 21:03; and on July 7, 2015 the term "Armenia mountain" was searched at 20:51 and 20:55.

30.      Access and use of the Website as described above can only be attributed to multiple Morgan Stanley employees using Yellen and/or Shannon's confidential password to access the Website without authority. The unauthorized Morgan Stanley employees reproduced scores of articles by accessing and viewing them on the Website. It is undisputed that only Yellen and/or Shannon was authorized to access, view, download and print the copyrighted articles and newsletters contained on the Website during the relevant subscription periods.

## AS AND FOR A FIRST CAUSE OF ACTION FOR DIRECT COPYRIGHT INFRINGEMENT AGAINST DEFENDANT MORGAN STANLEY

31.      Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 30 of this Complaint with the same force and effect as if set forth fully herein.

32.      Notwithstanding the provision of the Copyright Act that the display, distribution and reproduction of copyrighted works may lawfully be made only by the copyright owner or with its authorization, Defendant Morgan Stanley has willfully and without Plaintiff's permission infringed Plaintiff's copyrights by engaging in the systematic, regular and repeated unauthorized

access and viewing of the Website's various pages and the copyrighted articles contained therein.

33.     Plaintiff has been irreparably harmed by Defendant's unauthorized reproduction of their copyrighted works.

34.     In light of the foregoing, Plaintiff is entitled to the remedies provided for in 17 U.S.C. §§ 502 *et seq.*

## AS AND FOR A SECOND CAUSE OF ACTION FOR CONTRIBUTORY COPYRIGHT INFRINGEMENT AGAINST DEFENDANTS MORGAN STANLEY, YELLEN AND SHANNON

35.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 34 of this Complaint with the same force and effect as if set forth fully herein.

36.     Individuals using Yellen and/or Shannon's personal user identification and password have directly infringed the Plaintiff's copyrights on a daily basis by, for example, accessing the copyrighted Website material without authorization and creating unauthorized reproductions in violation of Plaintiff's exclusive rights under 17 U.S.C. §§ 106, 501.

37.     Defendants are liable as contributory infringers for the copyright infringement committed via the use of Yellen and/or Shannon's subscription information.  By sharing this confidential information and failing to ensure unauthorized employees were not partaking in the infringement, Defendants caused, enabled, facilitated, and materially contributed to that infringement.

38.     Defendants have actual knowledge of infringement.  Yellen and/or Shannon as the case may be, after purchasing a single subscription to the Website in his capacity as Morgan

Stanley employee, shared their confidential information with other Morgan Stanley employees unauthorized to receive this information, knowingly allowing the unauthorized employees to view, print and otherwise reproduce the Plaintiff's copyrighted materials.

39.     Through the conduct described above, Defendants are contributorily liable for the infringement described herein.

40.     Defendants' infringement was willful, intentional, purposeful, and in disregard of the rights of the Plaintiff, and has caused substantial damages to Plaintiff.

41.     Plaintiff is therefore entitled to statutory damages and other remedies provided for in 17 U.S.C. §§ 502 *et seq.*

## AS AND FOR A THIRD CAUSE OF ACTION FOR VICARIOUS COPYRIGHT INFRINGEMENT AGAINST DEFENDANT MORGAN STANLEY

42.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 41 of this Complaint with the same force and effect as if set forth fully herein.

43.     Unauthorized Morgan Stanley employees using the Website have directly infringed on Plaintiff's copyright on a regular basis by the above-described conduct in violation of Plaintiff's exclusive rights under the Copyright Act.

44.     Defendant Morgan Stanley is liable as vicarious infringers for the copyright infringement committed by the unauthorized use of Yellen and/or Shannon's confidential subscription information. At all times relevant to his action, Morgan Stanley (i) had the right and ability to control and/or supervise the infringing conduct in sharing the Website logon information, and (ii) had a direct financial interest in, and derived substantial financial benefit

from, the infringement of Plaintiff's copyrighted articles and other Website materials.

45. Morgan Stanley derived direct benefit from the infringement by gaining access to information and data that they would otherwise not have had access to. Morgan Stanley also avoided the business costs associated with purchasing the correct number of subscriptions for employees needing access to the Website and its content.

46. Through the conduct described above, Morgan Stanley is vicariously liable for the infringement of Plaintiff's rights.

47. Plaintiff is therefore entitled to statutory damages and other remedies provided for in 17 U.S.C. §§ 502 *et seq.*

## AS AND FOR A FOURTH CAUSE OF ACTION FOR BREACH OF CONTRACT AGAINST DEFENDANT YELLEN

48. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 47 of this Complaint with the same force and effect as if set forth fully herein.

49. Plaintiff and Yellen entered into a valid and enforceable agreement, under which Plaintiff provided single-user Internet access to the Website and a limited license for access by a single Morgan Stanley user, in this instance, Yellen. Plaintiff further provided a confidential password to Yellen and Yellen agreed that access would be limited to one user and not to permit any other person or entity to use the password to access the site or to use the password to access the site for anyone else.

50. Yellen breached his agreement with Plaintiff by providing the password to multiple persons and permitting those persons to use the password to access the Website for

purposes substantially in excess of his license.

51.     Section 15 of the Terms and Conditions for accessing the Website clearly states that a subscriber will be responsible for any professional fees incurred by Plaintiff as a result of his or her breach of the Terms, including sharing his or her log on information.  Yellen shared his username and password with numerous people breaching the Terms and entitling Plaintiff to reimbursement of its attorneys' fees.

## AS AND FOR A FIFTH CAUSE OF ACTION FOR BREACH OF CONTRACT AGAINST DEFENDANT SHANNON

52.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 51 of this Complaint with the same force and effect as if set forth fully herein.

53.     Plaintiff and Shannon entered into a valid and enforceable agreement, under which Plaintiff provided single-user Internet access to the Website and a limited license for access by a single Morgan Stanley user, in this instance, Shannon.  Plaintiff further provided a confidential password to Shannon and Shannon agreed that access would be limited to one user and not to permit any other person or entity to use the password to access the site or to use the password to access the site for anyone else.

54.     Shannon breached his agreement with Plaintiff by providing the password to multiple persons and permitting those persons to use the password to access the Website for purposes substantially in excess of his license.

55.     Section 15 of the Terms and Conditions for accessing the Website clearly states that a subscriber will be responsible for any professional fees incurred by Plaintiff as a result of

his or her breach of the Terms, including sharing his or her log on information.  Shannon shared his username and password with numerous people breaching the Terms and entitling Plaintiff to reimbursement of its attorneys' fees.

## AS AND FOR A SIXTH CAUSE OF ACTION FOR MISAPPROPRIATION OF TRADE SECRETS AGAINST DEFENDANT MORGAN STANLEY

56.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 55 of this Complaint with the same force and effect as if set forth fully herein.

57.    Plaintiff licensed a confidential password to Defendants Shannon and Yellen for use only by a single user, and that password was an item of independent economic value used in Plaintiff's businesses to obtain an advantage over those who did know or use it.  Information contained in articles on the password protected Website contains actionable intelligence that companies who subscribe to the Website may use for mergers, purchases, and to predict market trends.

58.    The confidential password's value is derived from not being generally known to, and not being readily ascertainable by, other persons who can obtain economic value from disclosure or use of the password.

59.    Without authorization from Plaintiff, Shannon and/or Yellen shared his confidential password with other Morgan Stanley employees; these employees misappropriated the password and used the password for their benefit when they knew they were not permitted to use the password to gain access to and reproduce copyrighted materials on their computers.

60.    Defendant Morgan Stanley's misappropriation of Plaintiff's confidential password was willful and malicious and caused irreparable damage to Plaintiff.

## AS AND FOR A SEVENTH CAUSE OF ACTION FOR FRAUD AND DECEIT AGAINST DEFENDANT MORGAN STANLEY

61.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 60 of this Complaint with the same force and effect as if fully set forth herein.

62.    To access the Website, Morgan Stanley's unauthorized employees misrepresented during various time periods in 2013, 2014 and 2015 that they were subscribers to the Website, when in fact only one subscription to the Website was ever purchased for any given time period, either by Defendant Shannon or Defendant Yellen.   By inputting Shannon and/or Yellen's confidential subscription information in order to log on to the Website, Morgan Stanley employees effectively represented that they were also subscribers to the Website because only subscribers received the confidential subscription information enabling them to access the Website.

63.    Morgan Stanley knew at all pertinent times that it was only permitted to have one user accessing the Website and still knowingly and intentionally allowed multiple employees to access the Website.

64.    Plaintiff reasonably relied on the representation that Morgan Stanley employees were Website subscribers, as the confidential password issued to Yellen and/or Shannon was used to gain the unauthorized access to the Website and its valuable copyrighted materials.

65.    Morgan Stanley's employees' misrepresentation caused Plaintiff to permit them

to have access to the Website to its detriment.

WHEREFORE, II demands judgment in its favor and against Defendants, as follows:

(1) that Defendants and its employees and agents be permanently enjoined from, directly or indirectly, infringing in any manner any of Plaintiff's copyrighted material and from disclosing confidential passwords to unauthorized persons and entities, and from inducing, aiding, causing or materially contributing to such infringement, including the provision of confidential passwords to unauthorized users, and from violating the Copyright Act, 17 U.S.C. § 501 *et seq.*

(2) that Defendants be required to pay Plaintiff $150,000 in statutory damages for intentional copyright infringement for every instance in which Plaintiff's copyright was infringed to be determined at trial but believed to be in excess of one hundred fifty (150) infringements totaling in excess of $22,500,000;

(3) that Defendants be required to pay Plaintiff its actual damages incurred as the result of Defendants' infringement of Plaintiff's copyrights;

(4) that Morgan Stanley be required to pay damages (such damages to include lost profits or Defendants' profits where appropriate), including without limitation treble damages, punitive damages, and exemplary damages, for misappropriation of trade secrets;

(5) that Yellen and/or Shannon be required to pay Plaintiff its direct and consequential damages incurred as the result of Yellen and/or Shannon's breach of its agreement with Plaintiff;

(6) that Defendants be required to pay Plaintiff their attorneys' fees and other costs of this action pursuant to their agreement with Plaintiff; and

(7) for such other and further relief as the Court may deem just and proper.

Dated: New York, New York
      February 8, 2016

THOMAS M. LANCIA PLLC
Attorney for Plaintiff **INSTITUTIONAL INVESTOR, LLC**

Thomas M. Lancia, Esq.
22 Cortlandt Street, 16th Floor
New York, New York 10007
212.964.3157
tlancia@lancialaw.com

25